UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DENISE MAE ORTIZ,                          *
                                           *
              Plaintiff,                   *
                                           *
       v.                                  *        Civil Action No. 1:21-cv-10792
                                           *
KILOLO KIJAKAZI, ACTING                    *
COMMISSIONER OF THE SOCIAL                 *
SECURITY ADMINISTRATION,                   *
                                           *
              Defendant.                   *

MEMORANDUM & ORDER

March 31, 2023

In this action, Plaintiff Denise Mae Ortiz asks the court to vacate the Commissioner of

Social Security's final decision and to remand the action for rehearing. Mot. for Order Reversing

the Commissioner's Decision ("Mot. to Reverse") [Doc. No. 17]; Pl.'s Mem. 15 [Doc. No. 18].

Defendant Acting Commissioner of the Social Security Administration ("Commissioner") moves

to affirm the final decision, asserting that the correct legal standard was applied, and the decision

is supported by substantial evidence. Mot. to Affirm the Decision of the Commissioner ("Mot. to

Affirm") [Doc. No. 21]. For the following reasons, Ortiz's Motion for Order Reversing the

Commissioner's Decision [Doc. No. 17] is DENIED and Defendant's Motion to Affirm the

Decision of the Commissioner [Doc. No. 21] is GRANTED.

I.      Procedural Background

On August 1, 2018, Ortiz submitted applications for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI") to the Social Security Administration.[1]

---

[1] Ortiz previously filed an application for SSI on September 12, 2007, alleging disability
beginning October 1, 2004. A.R. 79 [Doc. No. 12]. Her claim was initially denied on January 8,

Administrative Record ("A.R.") 15, 225-233, 234-235 [Doc. No. 12].[2] In both applications, Ortiz alleged disability beginning on June 1, 2017. Id. at 226, 234. On April 8, 2019, the Social Security Administration denied both claims, and on June 21, 2019, following Ortiz's request for reconsideration, the Social Security Administration again denied her claims. Id. at 156-159, 164-169. Ortiz later amended her alleged onset date to September 4, 2018. Id. at 39-41.

Ortiz timely requested an oral hearing, which took place before an Administrative Law Judge ("ALJ") on February 24, 2020. Id. at 35-75. In an April 24, 2020 written decision, the ALJ found Ortiz was not disabled within the meaning of the Social Security Act from September 4, 2018, the alleged onset date, through the date of the ALJ's written decision. Id. at 12-33. Ortiz requested review of the ALJ's decision, and the Social Security Administration Appeals Council denied her request on March 10, 2021. Id. at 1-6. On May 13, 2021, Ortiz filed the Complaint [Doc. No. 1] in this action.

## II.     Factual Background

### A.   Age, Education, and Work History

Ortiz has a twelfth-grade education. Id. at 271. On September 4, 2018 (the alleged disability onset date), she was fifty years old and worked part-time as a grocery store associate and as a donut shop crew member. A.R. 15, 271 [Doc. No. 12].

---

2008, and again upon reconsideration on July 24, 2008. Id. Ortiz subsequently requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 10, 2009. Id. The ALJ did not find Ortiz disabled under the SSA and issued a decision on December 23, 2009. Id. at 86. Ortiz did not appeal the decision, and this matter is not before this court.

[2] Page number correlates to the pagination used by the parties in their motions rather than the ECF docket pagination.

*B.  Medical History*

1.  <u>Musculoskeletal Issues</u>

On November 1, 2016, Ortiz reported experiencing stiffness, predominantly in her left hip, during a rheumatology consultation with Mark Robbins, MD. <u>Id.</u> at 1087. Dr. Robbins noted that Ortiz did not shows signs of sclerodactyly, and her metacarpophalangeal ("MCP") and proximal interphalangeal ("PIP") joints were without synovitis. <u>Id.</u> at 1088. Dr. Robbins also stated that Ortiz's PIP joints had a "mild bony enlargement," and that her hips were "diminished FABER bilaterally," [3] but her elbows, ankles, hands, and wrists otherwise appeared normal. <u>Id.</u> Ortiz followed up with Dr. Robbins on September 7, 2017. <u>Id.</u> at 527.

On January 22, 2018, as discussed further below, Ortiz visited Steven W. Paskal, MD, to follow up on a January 12, 2018 visit to the emergency department at Lawrence Memorial Hospital. <u>Id.</u> at 514. Dr. Paskal remarked that Ortiz's symptoms, based on the notes he received from the emergency department, seemed consistent with "muscle skeletal abdominal wall pain" but that her symptoms of limited scleroderma appeared stable. <u>Id.</u> at 515.

On July 11, 2018, Ortiz was seen by Joseph Audette, MD, at which time Ortiz reported diffuse pain over her joints and neck pain that extended to her right arm and thumb. <u>Id.</u> at 487. Ortiz also reported she experienced "neck and arm issue[s]." <u>Id.</u> at 488. In assessing Ortiz's condition, Dr. Audette reviewed Ortiz's imaging from 2015 showing C5-C6 level severe foraminal compromise with nerve root compromise, and he also observed indications of nerve pain, including a positive Spurling's test on the right, reduced pinprick in the right C6 region, and reduced right bicep reflexes. <u>Id.</u> at 487-489. Dr. Audette conducted a myofascial exam that revealed no evidence of trigger points in the postural muscles of the neck. <u>Id.</u> at 489. Dr. Audette

---

[3] The FABER test is used to identify the presence of hip pathology.

concluded that Ortiz was in no acute distress and did not show evidence of scoliosis or pelvic obliquity, but he noted increasing focal problems in her neck associated with intermittent radicular symptoms into her right arm and thumb. Id. Dr. Audette prescribed Gabapentin. Id.

On August 27, 2018, Ortiz saw Kathryn J. Dugger, NP, at which time Ortiz described her foot pain as "severe." Id. at 461. NP Dugger encouraged Ortiz to schedule an appointment with a podiatrist. Id. at 464. NP Dugger also noted that Ortiz was "doing well" taking Gabapentin to treat her multiple joint pain. Id.

On September 14, 2018 (ten days after the alleged disability onset date), Ortiz saw Jill F. Ashcraft, DPM, for a foot evaluation. Id. at 441. Ortiz complained of moderate, aching, sharp, and stabbing right and left foot pain. Id. Specifically, she complained of foot pain when ambulating, applying pressure, and wearing shoes, and she pointed to her metatarsal bones in her foot as the source of the pain. Id. Dr. Ashcraft did not observe pain with range of motion but noted evidence of a long second metatarsal, loss of second metatarsophalangeal joint space, increased intermetatarsal angle, and increased sesamoid position. Id. at 445. Dr. Ashcraft diagnosed Ortiz with capsulitis and recommended over-the-counter orthotics. Id. at 441, 445.

On November 27, 2018, Ortiz saw NP Dugger, who reported that Ortiz's "right foot pain is improved," that she "is actually back at work for 16-20 hours per week," and that she "feels tired but is able to do the work." Id. at 435-36. NP Dugger observed that Ortiz's primary osteoarthritis of her right hand was stable and recommended continuing the current treatment plan of daily Gabapentin to control her multiple joint pain. Id. at 439. NP Dugger also diagnosed Ortiz with limited scleroderma and primary osteoarthritis in her right hand and noted that Ortiz needed an appointment with a rheumatologist. Id.

On January 21, 2019, Ortiz saw state agency consultant Elaine Horn, MD, where Ortiz reported diffuse pain affecting all her joints, with additional problems in her neck that intermittently radiated down her right arm, hand, and thumb. Id. at 103-04. Dr. Horn noted that Ortiz had pain in her hips at night but did not display acute distress, tenderness over her back, or evidence of trigger point pain. Id. at 104. Dr. Horn observed that Ortiz's motor testing was intact and that she had mild reduced pinprick following a C6 pattern. Id. On Ortiz's symptom evaluations form, Dr. Horn assessed "the consistency of [Ortiz's] statements regarding symptoms considering the total medical and non-medical evidence in file" as "[p]artially consistent." Id. at 102. Additionally, when assessing Ortiz's "consistency regarding symptom related limitations," Dr. Horn indicated Ortiz's "[a]llegations appear exaggerated." Id. Dr. Horn concluded that Ortiz could stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, climb ramps, stairs, ladders, ropes, or scaffolds occasionally, stoop, kneel, crouch, or crawl with no limits, lift and/or carry up to 10 pounds frequently, and lift and/or carry up to 20 pounds occasionally. Id. at 103. State agency consultant Rosario Palmeri, MD, affirmed Dr. Horn's findings on June 13, 2019. Id. at 148-149.

Ortiz was referred by Dr.Paskal to Shiv Tej Sehra, MD, for a rheumatological evaluation and for further management of limited systemic sclerosis. Id. at 652. On February 28, 2019, Ortiz reported to Dr. Sehra persistent shortness of breath, and hand joint pain and swelling. Id. at 652. Dr. Sehra reported that Ortiz's x-ray appeared normal, but that she had an antinuclear antibody that was positive in an anticentromere pattern, mild sclerodactyly, and joint inflammatory arthritis. Id. at 652-654. Dr. Sehra concluded that Ortiz's "diagnosis is most consistent with limited systemic sclerosis." Id. at 653. Dr. Sehra noted that there is "no clear cause" for Ortiz's reported shortness of breath on exertion, and recommended repeating the ECHO examination. Id.

at 652, 654. To treat Ortiz's hand joint inflammatory arthritis, Dr. Sehra recommended starting Ortiz on hydroxychloroquine[4] and seeing an ophthalmologist within two weeks of beginning the medication. Id. at 654. Finally, Dr. Sehra recommended that Ortiz stop taking ibuprofen as it could worsen reflux. Id. On December 23, 2019, Dr. Sehra sent a letter to Dr. Paskal reporting that Ortiz was cleared to use hydroxychloroquine and summarized Ortiz's previous visits. Id. at 1236.

On January 31, 2020, Ortiz was seen by Dr. Paskal, at which time she complained of chronic pain and fatigue that worsened with prolonged standing. Id. at 1231, 1233. Dr. Paskal's treatment notes indicate Ortiz showed no evidence of radicular pain, her symptoms appeared to be improving, and she displayed no change in chronic exertional shortness of breath. Id. at 1231-1233. Dr. Paskal also stated that Ortiz's feet showed normal pulses and no redness or swelling, but there was some local tenderness on the right between the second and third metatarsal bones. Id. at 1231. Dr. Paskal concluded that Ortiz has improved from her injuries related to a recent fall, and he recommended both shoe inserts and seeing a podiatrist to treat the symptoms of "mild peripheral neuropathy" in her feet. Id. Dr. Paskal advised Ortiz that "she could go back to work at her usual level of restrictions," assuming she continued to feel her symptoms were improving. Id. at 1232.

On February 2, 2020, NP Dugger drafted a letter regarding Ortiz's treatment and noted that Ortiz had "chronic pain in her left leg and both feet." Id. at 1264. NP Dugger also stated that Ortiz was "unable to work more than 12 hours per week as a result of her chronic illness" and "can tolerate standing for one hour and then requires sitting for 5-10 minutes." Id. NP Dugger

---

[4] Dr. Sehra's treatment notes indicate that Ortiz was previously prescribed hydroxychloroquine and trazodone, but Ortiz never took these medications. Id. at 652-53.

wrote a similar statement on February 7, 2020, in which she added that Ortiz's chronic pain in her left leg and both feet was suspected as neuropathy and Morton's neuroma. Id. at 1267.

On February 11, 2020, Dr. Paskal completed a "Physical Impairment Questionnaire" regarding Ortiz's physical functionality. Id. at 1272-1274. Dr. Paskal described Ortiz's diagnosis as including polyarthralgia, hand inflammatory arthritis, and positive antinuclear antibody ("ANA") symptoms. Id. at 1272. Dr. Paskal also opined that Ortiz's symptoms "frequently" interfered with the attention and concentration required to perform simple work-related tasks. Id. Further, Dr. Paskal opined Ortiz would need to lie down in excess of the typical breaks, could walk for 1 block without rest or significant pain, could sit for 10 minutes at one time and stand or walk for 60 minutes at one time, could sit for one half hour total in an eight-hour workday, could stand or walk for 1 hour total in an 8-hour work day, would need a job which permits shifting positions at will from sitting, standing, or walking, would often need to take unscheduled breaks every half hour which would last around 10 minutes each, could frequently lift less than 10 pounds but never more, and would be absent more than 3 times per month due to impairments or treatments. Id. at 1272-1273. Dr. Paskal noted Ortiz would be able to grasp, turn, and twist objects for five percent of an 8-hour workday with her left hand and zero percent with her right hand, could never perform fine manipulation with her fingers, and could perform reaching activities with both arms for 10 percent of an 8-hour workday. Id. at 1273.

    2. Skin and Autoimmune Diseases

Dr. Horn's treatment notes from January 21, 2019, state that Ortiz has had a history of lupus. Id. at 103.

On February 28, 2019, Dr. Sehra confirmed Ortiz's diagnosis of Raynaud syndrome. Id. at 653. Dr. Sehra noted that because Ortiz's Raynaud's is "not particularly bothersome," there was no need for medication to treat the condition. Id. at 654.

Dr. Sehra's December 23, 2019 letter to Dr. Paskal noted that Ortiz has "no rashes grossly" but has mild sclerodactyly. Id. at 1238.

    3. Anxiety, Depression, and Alcohol Abuse Disorder

On September 8, 2016, NP Dugger listed "recurrent major depressive order" and alcohol use as two of Ortiz's ongoing medical issues. Id. at 556.

On November 15, 2017, Ortiz was seen by Toru Endo, MD, who diagnosed Ortiz with alcohol use disorder and recommended alcohol use counseling. Id. at 518, 522.

On July 11, 2018, Dr. Audette noted in his treatment notes that Ortiz "does admit to drinking on a regular basis to help with pain," and he advised Ortiz on the importance of alcohol cessation. Id. at 487- 490.

On July 23, 2018, NP Dugger listed "depression, major" and "alcohol abuse" on Ortiz's active problems list. Id. at 470-71.

On October 2, 2018, NP Dugger completed a "Physical Assessment" for Ortiz and indicated that Ortiz suffered from anxiety and depression. Id. at 425. Similarly, NP Dugger's treatment notes from November 27, 2018, state that Ortiz suffered from recurrent major depressive disorder and that Ortiz was "stable based upon symptoms and exam." Id. at 439.

    4. Other Impairments

On August 18, 2016, Ortiz reported aches and pains to Dr. Paskal. Id. at 569. Dr. Paskal diagnosed Ortiz with gastroesophageal reflux disease ("GERD") and recommended changing her diet and reducing alcohol intake. Id. at 570-72.

On November 1, 2016, Dr. Robbins conducted a soft tissue exam because Ortiz reported sleep disturbance and waking up twice at night. Id. at 1089. Dr. Robbins observed that Ortiz's soft tissue exam "does not appear to be positive for fibromyalgia pain." Id. However, on November 14, 2016, Dr. Robbins prescribed Ortiz trazodone to treat her "sleep disturbance/fibromyalgia/stress" and gave her a Pain Program Referral. Id. at 544. At a subsequent visit on September 7, 2017, Dr. Robbins noted that Ortiz tried taking two doses of trazodone to treat "sleep disturbance/fibromyalgia/stress," but she discontinued taking the medication due to the way it made her feel. Id. at 528. Ortiz also did not follow through on her Pain Program Referral. Id.

On January 12, 2018, Ortiz visited the emergency department at Lawrence Memorial Hospital due to abdominal pain radiating to her flank. Id. at 514. Dr. Paskal's follow-up treatment notes from January 22, 2018, state that Ortiz's CT scan showed two kidney stones and that her chemistry test was normal, other than a slight elevation in her liver function test. Id. Dr. Paskal also noted that Ortiz's abdominal symptoms had resolved since her visit to the emergency department. Id. at 515.

On July 20, 2018, Ortiz was seen by Charles Buzanis, MD at the request of Dr. Paskal after Ortiz experienced an episode of hematemesis about two weeks prior and for review of elevated liver tests. Id. at 476. Dr. Buzanis' treatment notes indicate Ortiz has had GERD symptoms that date back 10 years and which Ortiz usually treated with TUMS. Id. Dr. Buzanis recommended alcohol cessation and weight loss. Id. at 479.

On July 22, 2018, Ortiz saw Dr. Buzanis for an endoscopy to follow up on her episode of hematemesis. Id. at 466, 472-76. Dr. Buzanis indicated the endoscopic diagnosis was normal and recommended repeating lab testing in 3 months to monitor liver tests. Id. at 467. The next day,

on July 23, 2018, NP Dugger reported that Ortiz has not had any additional episodes of hematemesis. Id. at 470.

On February 28, 2019, Dr. Sehra noted that Ortiz had microscopic hematuria, and recommended a repeat urinalysis given her history of smoking and drinking and a follow-up with her primary care physician. Id. at 654.

On September 17, 2019, Ortiz saw Dr. Paskal for a follow-up at the request of her rheumatologist to review lab testing showing abnormal liver functions. Id. at 868. Ortiz continued to report poor health with a sense of fatigue, back, wrist, and hand pain. Id. Dr. Paskal noted that the results of the liver function test performed by the rheumatologist were "fairly similar" to the ones ordered by Dr. Paskal. Id. Ortiz expressed frustration that her liver function seemingly did not improve despite her effort to reduce her drinking. Id. Dr. Paskal did not observe any "acute changes" in Ortiz's other symptoms, and he recommended following up with a gastroenterologist and starting on hydroxychloroquine after seeing an ophthalmologist for a baseline eye exam. Id. at 868-869.

On January 29, 2020, Ortiz was seen by Kayla Carnell, PA, at the emergency department at Mount Auburn Hospital, where Ortiz reported falling over and hitting her head on a table while dancing intoxicated the night before. Id. at 1215. A cervical CT indicated mild cervical spondylosis without fracture or subluxation, a chest x-ray indicated mild thoracic spondylosis, and a pelvic x-ray indicated mild osteoarthritis of both hip joints that was stable from the prior exam. Id. at 1217-1227. Ortiz was able to move all extremities appropriately but was observed to have some pain to palpation in the left groin and the right gluteus. Id. at 1220. Following negative imaging, Ortiz was discharged with a recommendation to follow up with her primary care doctor. Id.

C.    ALJ Hearing Testimony

At the February 24, 2020 ALJ hearing, Ortiz testified that she lived in an apartment with her three children, aged twenty-five, sixteen, and fourteen. Id. at 42. Ortiz stated that she experiences pain in her feet, legs, lower back, and the joints in her hands. Id. at 46. She also testified that due to her scleroderma, she experiences pain in her ligaments, muscles, and connective tissues, especially on days when she experiences "flare-ups" that cause her to feel "striking pains." Id.

When asked about her spinal issues, Ortiz testified that she has constant neck pain that radiates down her right arm and causes numbness in her fingers. Id. at 47-48. She also stated that the pain from her neck radiates down her left leg. Id. at 48-49.

Ortiz further testified that due to her neuropathy, she experiences a constant painful, burning sensation in her feet that also causes numbness and tingling. Id. at 49. When asked about her hands, Ortiz stated her hands are always swollen and that she has atopic dermatitis.[5] Id. at 49-50. When asked about plantar fasciitis, Ortiz stated she experiences this condition in her left leg. Id. at 50.

When asked about her kidneys, Ortiz noted she had kidney stones several times and had lithotripsy twice to treat this condition. Id. at 50-51. She also noted that she wakes up throughout the night and feels fatigued during the day. Id. at 51.

Ortiz testified that she has not sought physical therapy in recent years but has found periodic injection into her knee helpful in relieving pain. Id. at 52-54. When asked about anxiety and depression, Ortiz stated she sometimes feels overwhelmed and experiences anxiety and

---

[5] Atopic dermatitis does not appear in Ortiz's medical record.

11

panic attacks, and that she last went to counseling in 2011. Id. at 54-56. She also testified that she avoids going to public places or social situations and has a couple of friends. Id. at 57.

When asked a series of questions pertaining to functionality, Ortiz testified that she can walk about 5 minutes, stand about 20 minutes, and sit about 30 minutes without having to stop and rest. Id. at 58. She also noted that she can lift about 5 to 7 pounds, reach with her arms above her head, climb stairs with rest, stoop or bend but with some difficulty, and kneel but with some pain. Id. at 58-59. Ortiz testified that she has lupus and cannot deal with extreme heat or extreme cold. Id. at 59-60. She further stated that when asked to work additional shifts at her job, she initially tried to do so but was unable to continue. Id. at 43-44. She had also been caught sitting during work on two occasions and has been reprimanded for doing so. Id. at 66.

Finally, Ortiz testified that she is able to grocery shop by herself, make her bed, cook about two simple meals per week, and use a smartphone and Facebook. Id. at 60-62. She also stated that she rarely cleans the apartment and that her children do the majority of the cleaning. Id. at 61.

### III.   Legal Standard

#### A.   Standard of Review

Under sentence four of 42 U.S.C. § 405(g), a district court has the power to affirm, modify or reverse a decision of the Commissioner, with or without remanding the cause for a rehearing. The district court must make its decision based on the pleadings and transcript of the record before the Commissioner; when the Commissioner's findings are supported by "substantial evidence" and conform to relevant law, they are conclusive. See Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018); see also Rodrigues Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (The court must affirm the Commissioner's decision "even if the

record arguably could justify a different conclusion, so long as it is supported by substantial evidence.").

Substantial evidence review is deferential; while "more than a scintilla of evidence is required to meet the benchmark, a preponderance of evidence is not." Purdy, 887 F.3d at 13 (internal quotations omitted). Substantial means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (internal citation and quotation omitted). However, the ALJ's decision is "not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999). The court can reverse the Commissioner's final decision when the "underlying facts and law are such that the agency has no discretion to act in any manner other than to award or deny benefits." Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001). However, if a court reverses the Commissioner's decision but there is no clear entitlement to benefits on the basis of the record before the court, the court must remand for further proceedings. Id. at 12 ("When an agency has not considered all relevant factors in taking action, or has provided insufficient explanation for its action, the reviewing court should ordinarily remand the case to the agency.") (citation omitted). "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985).

### B.  Social Security Disability Standard

An individual is considered disabled if they are "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Under the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether or not an individual is disabled. See 20 C.F.R §§ 404.1520(a), 416.920(a).

> The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or medically equals an impairment listed under 20 C.F.R. Part 404, Subpart P, Appendix 1, and meets the duration requirement; (4) whether the claimant has the residual functional capacity to perform his past relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education, and work experience.

Sastre v. Astrue, 870 F. Supp. 2d 267, 274 (D. Mass. 2012) (citing 20 C.F.R. § 416.920).

In the first four steps, the claimant bears the burden to show they are disabled within the meaning of the Social Security Act. See Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). "Once the claimant has established that he [or she] is unable to return to his former employment, the burden shifts to the Commissioner to prove the fifth step, that the claimant is able to engage in substantial gainful activity that exists in significant numbers in the national economy." Sastre, 870 F. Supp. 2d at 274.

### IV.    The ALJ's Decision

The ALJ proceeded through the five-step analysis under the Social Security Act, 20 CFR §§ 404.1520(a) and 416.920(a), to determine whether Ortiz was disabled from September 4, 2018, through the date of the decision. A.R. 15-27 [Doc. No. 12]. At the first step, the ALJ

determined Ortiz had not engaged in substantial gainful activity since September 4, 2018. Id. at 17. At the second step, the ALJ determined Ortiz had severe impairments, including limited scleroderma, inflammatory arthritis/Lupus/systemic scleroderma, degenerative disc disease ("DDD") of the spine, and plantar fasciitis, but that her other impairments – namely, GERD, kidney stones, Raynaud's syndrome, depressive disorder, anxiety disorder, and alcohol abuse disorder – were not severe. Id. at 18-20. The ALJ noted that the record did not reflect sufficient medical evidence to establish Ortiz's fibromyalgia and neuropathy as medically determinable impairments. Id. At the third step, the ALJ determined Ortiz's severe impairments did not meet or medically equal the severity of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 20.

At the fourth step, the ALJ determined Ortiz had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). Id. He found that Ortiz can: lift and carry 20 pounds occasionally and 10 pounds frequently, sit for 6 hours and stand or walk for 4 hours in an 8-hour day, alternate between sitting and standing for 5 minutes every 30 minutes, frequently handle and finger bilaterally, and occasionally push and pull with her bilateral lower extremities. Id. The ALJ determined Ortiz cannot climb ladders, rope or scaffolding but can occasionally kneel, stoop, crouch, crawl, and climb stairs and ramps. Id. Further, the ALJ found Ortiz can frequently maintain her balance but must avoid concentrated exposure to extreme cold, extreme heat, unprotected heights, and dangerous machinery. Id.

Based on Ortiz's residual functional capacity, at the fifth step of the analysis, the ALJ determined Ortiz was incapable of performing her past relevant work as a counter attendant and cashier. Id. at 25. The ALJ then concluded that considering Ortiz's age, education, work experience, and residual functional capacity, there are jobs that exist in the economy that Ortiz

could perform. Id. Thus, the ALJ concluded Ortiz "has not been under a disability" from September 14, 2018, through April 24, 2020, the decision date. Id. at 26.

## V.     Analysis

### A.   Whether the ALJ Improperly Determined Ortiz's Residual Functional Capacity

Ortiz argues that this court should vacate the final decision and remand the matter for further administrative proceedings because the ALJ did not properly consider Dr. Paskal's assessment of Ortiz's impairments in determining her residual functional capacity and did not provide proper rationale for finding Dr. Paskal's opinion unpersuasive. Pl.'s Mem. 8-9 [Doc. No. 18]. Ortiz further alleges that in finding Dr. Paskal's opinion unpersuasive when determining her residual functional capacity, the ALJ improperly assessed her condition based on her daily activities, part-time employment, and testimony regarding health-related limitations. Id. at 13-15.

### 1.    Consideration of Medical Opinions in Residual Functional Capacity Assessments

"A medical opinion is a statement from a medical source about what [a claimant] can still do despite [the claimant's] impairment(s) and whether [the claimant] ha[s] one or more impairment-related limitation or restrictions." 20 C.F.R. § 404.1413(a)(2). When there are inconsistencies in the evidence, including medical opinions, the ALJ is obligated to weigh all the evidence, id. at § 416.920c(b), including the opinions of state agency medical or psychological consultants and the claimant's treating physicians, but is not bound by these opinions, id. §§ 416.920c(a)-(c), 404.1520c(a)-(c). The decision must articulate how the ALJ "considered the medical opinions or prior administrative medical findings from that medical source"; "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings"; and if two opinions are equally supported and consistent with the record but arrive at different conclusions, "articulate how [the ALJ] considered the other

most persuasive factors" to make a determination. Id. § 416.920c(b); see also § 404.1520c(b).

"The most important factors to be considered when the Commissioner evaluates persuasiveness are supportability and consistency; these are usually the only factors the ALJ is required to articulate." Nicole C. v. Saul, 2020 WL 57727, at *4 (D.R.I. Jan. 6, 2020) (citing 20 C.F.R. § 404.1520c(b)(2)); see also Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5854 (Jan. 18, 2017) ("A medical opinion without supporting evidence, or one that is inconsistent with evidence from other sources, will not be persuasive regardless of who made the medical opinion."). Moreover, under 20 C.F.R. § 404.1520c, an ALJ is not required to weigh the opinion of a claimant's treating physician more heavily than the opinions of other medical providers. See Harrison v. Saul, 2021 WL 1153028, at *5-6 (D. Mass. March 26, 2021).

The ALJ considered the opinions of state agency physicians, two rheumatologists, a podiatrist, an ophthalmologist, a nurse practitioner, DDS medical consultants, and Ortiz's treating physicians, and found a residual functional capacity generally as described by the state agency physicians. A.R. 20-25, 148-49 [Doc. No. 12]. For example, where Dr. Paskal concluded that Ortiz could sit for 10 minutes at a time and could sit for 30 minutes total during an 8-hour workday, the ALJ adopted the state agency physicians' conclusion that she could sit for about 6 hours. Id. at 20, 1272-1274. Where Dr. Paskal determined that Ortiz could stand or walk for 1 hour at a time and stand or walk for 1 hour in an 8-hour workday, and the state agency physicians found Ortiz could stand or walk for about 6 hours in an 8-hour workday, the ALJ concluded that she could stand or walk for 4 hours. Id. Where Dr. Paskal did not comment on whether Ortiz could climb stairs, ramps or ladders and could never stoop, kneel, crouch, or crawl, the ALJ adopted the state agency physicians' conclusion that she could occasionally do

these tasks. Id. Finally, where Dr. Paskal concluded that Ortiz could frequently lift and carry less than 10 pounds and never more than 10 pounds, the ALJ adopted the state agency physicians' conclusion that she could frequently lift and carry up to 10 pounds and occasionally lift and carry 20 pounds. Id.

The ALJ explained that he found Dr. Paskal's opinion unpersuasive because "the limitations in the opinion are not supported by the objective medical evidence of record," and the mental RFC questionnaire completed by Dr. Paskal was "inconsistent with the claimant's lack of treatment with outpatient mental health providers." Id. at 25. The ALJ found the opinions of the state agency physicians to be "partially persuasive" because "their opinions are consistent with the claimant's conservative treatment history of her spinal pain, mild findings on recent spinal imaging, non-focal neurological exams, largely mild rheumatologic clinical findings, and improvement of her foot pain with conservative treatment." Id. at 24. The ALJ noted that the opinions of the state physicians were only "partially persuasive" in the residual functional capacity determination because the ALJ also considered "additional walking/standing and manipulative limitations" that Ortiz presented at her hearing, along with other medical evidence provided during the hearing. Id.

The ALJ's articulation supports his general adoption of the findings of the state agency physicians over those of Dr. Paskal regarding Ortiz's range of movement and the durations given by the state agency physicians for sitting (up to six hours) and walking/standing (up to four hours). These conclusions are supported by the medical record, which includes evidence such as Dr. Robbins' observation that Ortiz's elbows, ankles, hands, and wrists, and shoulders appeared "normal," id. at 1088, NP Dugger's conclusion that Ortiz was "doing well" when taking Gabapentin to treat her joint pain, id. at 464, and Dr. Ashcraft's recommendation of only over-

the-counter orthotics to treat foot pain, id. at 445. Notably, the ALJ did not adopt the state agency physicians' findings in full and without question. Rather, he adjusted Ortiz's residual functional capacity downward to account for her "medically determinable impairments" that "could reasonably be expected to cause the alleged symptoms." Id. at 21. For instance, in rejecting Dr. Paskal's conclusion that Ortiz could sit for only 30 minutes total during an 8-hour workday and stand or walk for only 1 hour, the ALJ acknowledged Ortiz's history of spinal pain, foot pain, and scleroderma, but he concluded that her "neurological exam was grossly intact," her "pain was improving overall," she had "normal strength and sensation in her feet" according to her podiatrist, and "the objective medical evidence of record does not support the level of scleroderma pain and symptoms alleged by the claimant." Id. at 21-23. The ALJ also noted Ortiz, herself, reported on multiple occasions that her pain was improving overall and that she was "able to function." Id. at 22.

Here, in determining Ortiz's residual functional capacity, the ALJ sufficiently articulated his consideration of the persuasiveness of Dr. Paskal's opinion given the other medical opinions on record. Importantly, the ALJ is not bound by any specific medical opinion and is not required to weigh the opinion of Dr. Paskal, who is Ortiz's treating physician, more heavily than the opinions of her other medical providers, including the state agency physicians. 20 C.F.R. §§ 416.920c(a)-(c), 404.1520c(a)-(c); see Harrison, 2021 WL 1153028, at *5-6. Accordingly, the court finds the ALJ did not improperly find Dr. Paskal's opinion unpersuasive when determining Ortiz's RFC.

2. Consideration of Daily Activities and Absenteeism in Residual Functional Capacity Assessments

An ALJ is required to consider evidence of absenteeism as part of their duty to consider all the evidence in the record when rendering their decision. See Rosario Mercado v. Saul, 2020

WL 2735980 at *10-11 (D. Mass. May 26, 2020); see Lopez-Lopez v. Colvin, 138 F.Supp.3d 96, 113-14 (D. Mass. 2015). This is because consistent absenteeism can preclude a claimant from retaining full-time employment. See Sacilowski v. Saul, 959 F.3d 431, 435-36 (1st Cir. 2020). While remand is required whenever there is evidence of absenteeism that the ALJ has clearly ignored or contradicted without explanation, this requirement is in tension with the presumption that the ALJ has considered all evidence in the record, even if it is not explicitly mentioned in their decision. Miller ex rel. K.M. v. Astrue, 2011 WL 2462473 at *11 (D. Mass. June 16, 2011); see Walker v. Barnhart, 2005 WL 2323169 at *18 (D. Mass. August 23, 2005) (finding the ALJ improperly substituted his own opinions regarding absenteeism for medical evidence, even though that medical evidence may have lacked credibility).

Here, Ortiz argues that her residual functional capacity determination was not appropriately limited because the ALJ did not address that her condition causes, and would continue to cause, significant absenteeism and hinder her ability to retain full time employment. Pl.'s Mem. 12-13 [Doc. No. 18]. Specifically, Ortiz testified during the oral hearing that she was unable to work additional shifts at her job when asked to do so by her supervisor, and she has been caught and reprimanded for sitting at work on two occasions. A.R. 43-44, 65-66 [Doc. No. 12]. Thus, she asserts "the ALJ makes no analysis of [Ortiz's] work activities other than the statement that she was working, in general." Pl.'s Mem. 12 [Doc. No. 18]. Defendant counters that Ortiz's part-time job at Stop & Shop suggests her ability to perform light work and the ALJ is, at any rate, not required to consider other's statements about whether the individual is or is not able to perform regular or continuing work. Def.'s Mem. 18-19 [Doc. No. 22]. Defendant therefore asserts the ALJ properly accounted for Ortiz's exertional, manipulative, and postural limitations. Id. at 18.

The ALJ properly considered evidence of absenteeism in determining Ortiz's residual functional capacity because he noted that Ortiz herself reported in November 2018 that she was working 16-20 hours per week and "that she was feeling tired but was 'able to do the work.'" A.R. 22-23 [Doc. No. 12]. The ALJ also noted that Ortiz reported that "her pain was improving overall and that she was 'able to function.'" Id. at 23. Thus, although the ALJ did not explicitly address Ortiz's alleged absenteeism in his decision, he cannot be said to have ignored or contradicted evidence of absenteeism in his residual functional capacity assessment. While Ortiz asserts that her "work capacity is far removed from what a full-time employee could perform," Pl.'s Mem. 12 [Doc. No. 18], the ALJ's decision and articulation of the evidence reflects his view that Ortiz is able to perform light, full-time work, even if she is unable to perform any past relevant full-time work. A.R. 20 [Doc. No. 12].

Similarly, "[e]xamining the claimant's daily activities helps to shed light on the veracity of the claimant's claims of pain and illuminate an RFC determination." Bazile v. Apfel, 113 F. Supp. 2d 181, 189 (D. Mass. 2000). For instance, in Aguiar v. Apfel, 99 F. Supp. 2d 130, 138 (D. Mass. 2000), the court found that the ALJ did not properly assess the record and consider the available evidence before him because he failed "to properly inquire into Plaintiff's daily activities or address Plaintiff's assertions of pain" when engaging in those activities.

Here, Ortiz asserts the ALJ improperly concluded that Dr. Paskal's opinion "was inconsistent with [Ortiz's] activities including caring for two children, shopping, and driving." Pl.'s Mem. 13 [Doc. No. 18]. Specifically, Ortiz takes issue with the ALJ's statement that she is the "primary caregiver to 2 children with behavioral issues" and that she is able to care for her children, drive, and shop. Id.; A.R. 24 [Doc. No. 12].

In determining Ortiz's residual functional capacity, the ALJ considered the evidence available regarding Ortiz's daily activities and her role as a caregiver to her children. First, the evidence indicates that when Ortiz's children were 6 and 8 years old, they experienced "behavioral and emotional issues" and had been in foster care for an unspecified amount of time. A.R. 472 [Doc. No. 12]. The record also indicates that Ortiz's son is now in an unspecified "program" and her 23-year-old daughter is "doing well" on her own. Id. Second, during the oral hearing, Ortiz testified that she is able to drive without limitations, that she can shop for groceries independently, and that she does not clean, apart from making her bed. Id. at 42, 60-61. Based on these facts, the ALJ concluded the limitations presented in Dr. Paskal's opinion are "inconsistent with the claimant's reported activities, which include working a part time job, caring for 2 children with behavioral issues, driving, and shopping for groceries." Id. at 25. While the characterization of the behavioral pattern of Ortiz's children may or may not be accurate, Ortiz does not establish that given the other evidence presented, the ALJ failed to properly consider her daily activities in assessing her pain and arriving at her residual functional capacity determination.

### 3.   Consideration of Claimant Statements

Before an ALJ may disregard a claimant's allegations of pain and specific symptoms, the ALJ must articulate "specific findings as to the relevant evidence he considered in determining to disbelieve" the claimant. Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986). "A proper credibility determination is entitled to deference." Sastre, 870 F. Supp. 2d at 278.

Here, Ortiz contends the ALJ improperly concluded that her testimony regarding her part-time employment and pain-related limitations is inconsistent with Dr. Paskal's medical

opinion. Pl.'s Mem. 11-13 [Doc. No. 18]. However, the ALJ's written opinion described evidence in the record that contradicts both Ortiz's alleged level of pain and Dr. Paskal's assessment of how that pain affects Ortiz's ability to work. This contradictory evidence includes: medical records of Ortiz's treating physicians documenting Ortiz's physical impairment and also improvements in Ortiz's condition with treatment, including steroid injections and pain medication; that her treatment history had been "conservative"; that Ortiz was not currently taking pain medication; and that while physical examinations consistently documented some pain and mild pathology, examinations had also consistently shown no "focal neurological deficits or gait abnormalities" but rather "good ROM in her neck, shoulders, and hips." A.R. 21-25 [Doc. No. 12].

The ALJ then considered the impairments and how they would affect Ortiz's ability to work, noting that while her impairments "could reasonably be expected to cause the alleged symptoms," the residual functional capacity "contains exertional, postural, manipulative, and environmental limitations allowing her scleroderma pain and symptoms." Id. at 21-22. Thus, rather than simply adopt the opinions of the state agency physicians, the ALJ adjusted Ortiz's residual functional capacity downward to account for these limitations described by both Ortiz herself and Dr. Paskal. However, the ALJ concluded that Ortiz's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Id. at 21.

Because the ALJ's credibility determination is entitled to deference when supported by objective evidence, see Sastre, 870 F. Supp. 2d at 278, and the ALJ properly weighed Ortiz's alleged level of pain and Dr. Paskal's opinion against the treatment notes and medical testimonies of Ortiz's other providers, Ortiz's subjective complaints need not be reconsidered.

And because the ALJ properly considered the opinions of Ortiz's various medical providers, her alleged absenteeism and daily activities, and her own subjective testimony, he did not err in determining Ortiz's residual functional capacity.

> B.   *Whether the ALJ Improperly Provided the Same Rationale for Weighing Two Unique Medical Opinions*

Ortiz alleges "the ALJ has failed to evaluate the opinion of Dr. Paskal as unique from that of NP Dugger," or in other words, the ALJ used the same rationale for dismissing the opinions of both Dr. Paskal and NP Dugger, and that he therefore failed to evaluate each medical opinion in compliance with the law. Pl.'s Mem. 9 [Doc. No. 18]. Defendant counters that because the opinions of Dr. Paskal and NP Dugger were "identical concerning Plaintiff's standing ability," the ALJ did not err in using the same rationale to find each source unpersuasive. Def.'s Mem. 13 [Doc. No. 22].

The law is clear that "[t]he hearing officer is not required to – nor could he reasonably – discuss every piece of evidence in the record." Johnson v. Colvin, 204 F.Supp.3d 396, 409 (D. Mass. 2016) (citing Sousa v. Astrue, 783 F.Supp.2d 226, 234 (D. Mass. 2011)); see also Bourinot v. Colvin, 95 F.Supp.3d 161, 177 (D. Mass. 2015) (finding that the ALJ is not required to explicitly state how each evidentiary factor was considered). However, there is a presumption that the ALJ considered all the evidence in the record when making its decision. Quigley v. Barnhart, 224 F.Supp.2d 357, 369 (D. Mass. 2002)). Thus, because there is no explicit requirement that ALJs note their findings regarding every piece of relevant evidence, district courts will not remand a case just because the ALJ failed to do so. Id. Moreover, in assigning less weight to a given medical opinion, an ALJ need not expressly cite what evidence is being relied upon if the evidence has already been considered and discussed in the decision. See Lobov v. Colvin, 2014 WL 3386567, at *12 (D. Mass. June 23, 2014) (holding that "even if it would

have been helpful had the ALJ expressly cited the inconsistencies that supported his assignment of non-controlling weight, it is settled that an ALJ is not required to expressly refer to each document in the record, piece-by-piece") (citation and quotations omitted).

The ALJ cited the same evidence and used the same rationale, verbatim, in finding Dr. Paskal's opinion and NP Dugger's opinion unpersuasive, concluding that Ortiz "does not present clinically with any focal neurological deficits or gait abnormalities, her most recent spinal imaging studies only showed mild pathology, and she exhibits a good ROM in her neck, shoulders, and hips," and she is able to work a part-time job, care for her children, drive, and shop. A.R. 24-25 [Doc. No. 12]. Although Ortiz argues that the ALJ did not discuss a cervical MRI when discounting Dr. Paskal's and NP Dugger's opinions, see Pl.'s Mem. 11-12 [Doc. No. 18], the ALJ was not required to discuss and expressly cite every piece of evidence he looked at to reach his conclusion. See Johnson, 204 F.Supp.3d at 409. Accordingly, Ortiz has shown no error here.

### VI.    Conclusion

For the foregoing reasons Ortiz's Motion [Doc. No. 17] is DENIED, the Commissioner's Motion [Doc. No. 21] is GRANTED, and the decision of the Commissioner is AFFIRMED.


IT IS SO ORDERED.

March 31, 2023                                              /s/ Indira Talwani_____
                                                           United States District Judge